***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman. The appealing party has shown good grounds to reconsider the evidence and modify the Opinion and Award with regard to the issue of plaintiff's entitlement to temporary partial disability.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a pretrial agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee/employer relationship existed between the named employee and named employer at the relevant time in question.
3. The employer is self-insured and GAB Robins is the Servicing Agent.
4. Plaintiff's average weekly wage was $400.00.
5. The employee sustained an injury by accident arising out of and in the course of her employment on December 10, 1998.
6. The employee has been paid certain temporary total and temporary partial benefits as set forth in documentation which was stipulated into evidence at the hearing before the deputy commissioner.
7. The employee was paid wages at a reduced rate upon returning to work for employer, which wages were set forth in documentation stipulated into evidence at the hearing before the deputy commissioner.
In addition, the parties stipulated into evidence the following:
1. Documents relating to benefits paid to plaintiff.
 2. Documents relating to wages plaintiff earned with defendant.
 3. Packet of Industrial Commission forms previously submitted in the case.
4. Packet of medical records and reports.
 5. Additional medical records submitted by letter dated January 11, 2001.
 6. The depositions of John P. Robertson, M.D., Alan Tamadon, M.D., and Angelo A. Tellis, M.D. are a part of the evidentiary record in this case.
 ***********
Based upon the evidence of record, the Full Commission adopts in part and modifies in part the findings of fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. At the time of hearing before the deputy commissioner, plaintiff was thirty-eight years old and a high school graduate. She was also a full time student at Carteret Community College pursuing an associate's degree in photography.
2. Plaintiff began working for defendant's predecessor in 1986 and initially worked in the packaging department. After defendant purchased the facility, plaintiff worked in automatic folding and she was moved to manual folding in approximately early November 1998. The job involved folding, pinning and tagging shirts, placing them into bags and then stacking them into a large box.
3. On December 10, 1998 plaintiff sustained a compensable injury at work. Plaintiff had accumulated a number of filled boxes which had not yet been removed from her workstation and she used her right foot to push the stack of boxes to the side. Following this incident, plaintiff's right leg felt like it was cramping. During the next several weeks, plaintiff treated herself, thinking that she had a potassium deficiency, but then she reported the injury and was sent to Carteret Urgent Care Center where she saw a nurse practitioner. The nurse treated plaintiff for a sprained hamstring with medication, exercise therapy and work restrictions. However, plaintiff remained symptomatic and ultimately saw Dr. Gray at Carteret Urgent Care Center who ordered an MRI. The test revealed that plaintiff had an apparent herniated disc at L5-S1.
4. Plaintiff was then referred to Dr. Tamadon, a physiatrist, who examined her on February 19, 1999. Dr. Tamadon found signs of an L5-S1 radiculopathy; so, he ordered epidural steroid injections and recommended that plaintiff be evaluated by a neurosurgeon. Dr. Gray then referred plaintiff to Dr. Held, a neurosurgeon. Dr. Held examined plaintiff on March 23, 1999 and concurred with the recommendation for epidural steroid injections. Plaintiff underwent the injections but reported minimal improvement. Plaintiff's findings were not very strong, so Dr. Held ordered a myelogram/CT scan, which apparently was reported to be negative. Since Dr. Held thought there was a defect shown by the CT scan, he ordered a nerve root block as a diagnostic test to see if it would provide pain relief. The block did give plaintiff good relief so Dr. Held concluded that her symptoms were stemming from the S1 nerve root. Consequently, Dr. Held recommended surgery, although he advised that plaintiff's chances of improvement were not as high as normal.
5. After seeing Dr. Melin for a second opinion regarding the surgical option, plaintiff underwent surgery by Dr. Held on August 4, 1999 to decompress the L5-S1 interspace. Afterwards, plaintiff subjectively indicated that she did not obtain significant relief from the procedure. However, objectively plaintiff's ankle reflex returned and her dysesthesias improved. A repeat MRI also revealed good nerve root decompression with only the expected amount of scarring.
6. Dr. Tamadon had moved to Wilmington by this time, so plaintiff was referred for symptomatic treatment to Dr. Tellis, another physiatrist who had started working at that practice. Dr. Tellis saw plaintiff on August 27, 1999 for complaints of persistent low back and right leg pain. During the next several months, Dr. Tellis treated plaintiff with medication, a sacroiliac joint injection and a TENS unit, but she continued to complain of pain. Dr. Tellis encouraged plaintiff to increase her activities and in September released her to return to work at light-duty with the restriction of lifting no greater than forty pounds.
7. Plaintiff returned to light duty work in September 1999 and gradually increased her working hours over the course of the next several months. Plaintiff initially did some office work and then was given a job inspecting shirts, since her former job in packaging was no longer available. The inspection job involved lifting a bundle containing four to thirty-six shirts and examining each shirt for defects and stains. The position was well within plaintiff's physical restrictions. Nevertheless, she performed it at a very slow pace. The maximum wage plaintiff could earn in this new inspection position was $7.16 per hour which was less than plaintiff's hourly wage of $10.00 per hour that she was earning prior to her injury in her former packaging position. However, plaintiff did not work at a sufficient rate to meet production, so she was paid $5.50 per hour instead of the standard $7.16 per hour. Significantly, the greater weight of the evidence of record demonstrates that plaintiff's true wage-earning capacity is $7.16 per hour and plaintiff's actual earnings of $5.50 per hour are not as a result of her November 1998 injury by accident.
8. Dr. Tellis continued to prescribe narcotic pain medication for plaintiff through the January 6, 2000 office visit. Since prolonged use of narcotics would not generally be advisable and since plaintiff was suffering from significant gastrointestinal problems associated with the medicine, plaintiff's medical case manager set up an appointment with Dr. Tamadon. Dr. Tamadon examined plaintiff on February 1, 2000. At the time of Dr. Tamadon's evaluation of plaintiff, her gait was normal, she had full range of motion, and her sensation, strength and reflexes were normal. Plaintiff did complain of pain when Dr. Tamadon palpated certain areas, most of which were not related to her back. Dr. Tamadon reviewed the MRI, myelogram and CT scan which showed no evidence of nerve impingement and he ordered nerve testing which revealed no evidence of radiculopathy or peripheral neuropathy. In view of the lack of objective findings, Dr. Tamadon advised plaintiff to wean herself off narcotic medication and continued her restrictions against lifting more than forty pounds.
9. Sometime after plaintiff's February 1, 2000 visit with Dr. Tamadon, defendant, through the case manager, advised plaintiff and Dr. Tellis that Dr. Tellis was no longer authorized to treat her and that she should return to Dr. Tamadon for further medical care. Plaintiff refused to go back to Dr. Tamadon and continued to see Dr. Tellis despite lack of authorization. However, an Administrative Order was filed March 20, 2000 directing plaintiff to see Dr. Tamadon and to cooperate with the case manager.
10. On April 19, 2000 plaintiff went back to Dr. Tamadon. By that time plaintiff was only taking one Lorcet per day, and Dr. Tamadon advised plaintiff to discontinue the medication altogether. Since Dr. Tellis had started treating plaintiff for piriformis syndrome, plaintiff asked Dr. Tamadon about that condition. Dr. Tamadon found no evidence of plaintiff having the condition and did not recommend treatment for her, but he did describe the condition generally for her and explained the nature of the usual treatment. Plaintiff appeared to have reached maximum medical improvement with respect to her back injury by that date, so Dr. Tamadon released her from medical care and advised her that she could work without restrictions.
11. Plaintiff continued to see Dr. Tellis although he was no longer the authorized treating physician until June 7, 2000 when he released her from his care. Although Dr. Tellis had thought plaintiff might have piriformis syndrome, diagnostic procedures had not confirmed the diagnosis and he concluded that her symptoms were probably due to myofascial pain. In Dr. Tellis's opinion plaintiff had reached maximum medical improvement by that date. Dr. Tellis referred her to Dr. Robertson, an anesthesiologist and pain management specialist, for further prescriptions. Defendant would not authorize the treatment by Dr. Robertson, but plaintiff went to him nevertheless and he resumed treatment with narcotic medication.
12. Plaintiff continued working as an inspector for defendant until June 23, 2000 when the company closed and began laying off its employees. By that time plaintiff had been working as an inspector at the wage of $5.50 per hour on a full time basis for several months. After being laid off, plaintiff decided to go back to school for further education in lieu of finding alternative employment. Consequently, plaintiff made minimal, if any, effort to identify other available work. Plaintiff was not removed from light duty work by any physician; moreover, there were jobs in the area within plaintiff's physical work restrictions which were available and which plaintiff could have obtained had she sought them.
13. Defendant admitted liability for plaintiff's injury pursuant to a Form 60 which was filed with the Industrial Commission. Compensation was paid to plaintiff for temporary total and temporary partial disability through April 15, 2000. By April 15, 2000, plaintiff was working as an inspector on a full time basis but was earning $5.50 per hour which was less than her wage earning capacity of $7.16 per hour as of that date. Plaintiff's wage earning capacity as of April 15, 2000 of $7.16 per hour is less than the $10.00 per hour wage earning capacity before her work-related injury in November 1998.
14. Plaintiff remained capable of performing full-time, light duty work with a wage earning capacity of $7.16 per hour until June 23, 2000 when she was laid off. After that time, plaintiff voluntarily removed herself from the job market in order to attend school. Plaintiff has failed to prove that she suffered a loss of wage-earning capacity at that time. Accordingly, plaintiff's current wage earning capacity is $7.16 per hour.
15. On April 19, 2000 plaintiff reached maximum medical improvement with respect to the injury by accident giving rise to this claim. She sustained a ten-percent permanent partial disability to her back.
16. In view of the fact that Dr. Tellis prescribed narcotic medication for plaintiff throughout his period of treatment, despite her minimal objective findings and the side effects she was experiencing from the medication, defendant had reasonable grounds to question his treatment and to refer plaintiff elsewhere for another opinion. Dr. Tamadon verified the concerns. Consequently, it appears that defendant justifiably refused to authorize further treatment by Dr. Tellis. It was in plaintiff's best interest to be weaned off the narcotic medication. Although plaintiff had reason to object to the travel to Wilmington, the evidence did not reveal a doctor closer to her home who would have been a suitable alternative. Dr. Robertson was not a suitable doctor since he also continued to prescribe narcotic medication; therefore, it is necessary to have an Industrial Commission Nurse review this case and make an appropriate referral of plaintiff to a pain management specialist for further needed treatment.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Subject to a reasonable attorney's fee, plaintiff is entitled to temporary partial disability compensation beginning April 15, 2000 for three-hundred weeks from the date of her original injury, December 10, 1998, at the rate of $75.74 per week which constitutes two-thirds of the difference between plaintiff's $10.00 per hour pre-injury wage and plaintiff's post-injury $7.16 per hour wage earning capacity. N.C.G.S. § 97-30.
2. Furthermore, plaintiff sustained a ten (10) percent permanent partial disability to her back as a result of this injury by accident. However, plaintiff is entitled to elect the more munificent remedy between those provided in N.C.G.S. § 97-30 and N.C.G.S. § 97-31
which appears to be the temporary partial disability. N.C.G.S. § 97-31
(23).
3. In that defendant had reasonable grounds to question the treatment provided by Dr. Tellis to plaintiff and to transfer authorization to Dr. Tamadon, the treatment by Dr. Tellis after notification of the fact that he was no longer an authorized treating physician should not be authorized now by the Industrial Commission. Nor should the treatment by Dr. Robertson be approved. N.C.G.S. § 97-2(19); N.C.G.S. § 97-25;Schofield v. The Great Atlantic Pacific Tea Company, Inc. 299 N.C. 582
(1980).
4. Subject to the limitations of N.C.G.S. § 97-25.1, plaintiff is entitled to have defendants provide all reasonably necessary medical compensation arising from this injury by accident which tends to effect a cure, provide relief or lessen the period of disability, but excluding the treatment rendered by Dr. Tellis after authorization was withdrawn and any treatment by Dr. Robertson. N.C.G.S. § 97-2(19); N.C.G.S. § 97-25; N.C.G.S. § 97-25.1.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission modifies and affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff at the rate of $75.74 per week for the remainder of three hundred (300) weeks from the date of her original injury for temporary partial disability beginning April 15, 2000. The portion of this compensation that has accrued shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident, but excluding those arising from the treatment by Dr. Tellis and Dr. Robertson after defendant withdrew authorization.
3. An attorney's fee in the amount of twenty-five (25) percent of the compensation awarded is hereby approved for plaintiff's counsel. This fee amount shall be paid directly to Ms. Lyles by deducting the same from the accrued lump sum and thereafter by every fourth check.
4. It is further ordered that this matter is referred to the Industrial Commission Rehabilitation Nurse Section for assignment of an Industrial Commission nurse to review this case and make an appropriate referral of plaintiff to a pain management specialist for further needed treatment. Plaintiff is also ordered to cooperate with the assigned nurse.
5. Defendants shall pay the costs due this Commission.
This the 21st day of February 2002.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER